[No. 4181.   Decided October 2, 1902.]

HENRY W. STERRETT, *Respondent,* v. NORTHPORT MINING
AND SMELTING COMPANY, *Appellant.*

TRIAL — EXCEPTIONS TO INSTRUCTIONS — TIMELINESS.

Exceptions to the giving and the refusing of instructions will
not be considered on appeal, where they were not taken until after
verdict.

PLEADING — VARIANCE — ACTION FOR TOTAL DESTRUCTION OF PROP-
ERTY — PROOF OF PARTIAL DESTRUCTION.

Under Bal. Code, § 4949, which provides that no variance shall
be deemed material, unless it shall have actually misled the ad-
verse party, the fact that plaintiff proved only a partial destruc-
tion of his property by reason of the fumes arising from defend-
ant's smelter, while his complaint asked damages for the total
destruction of his property, would be but an immaterial variance.

INJURIES CAUSED BY SMELTER FUMES — SUFFICIENCY OF EVIDENCE.

In an action to recover damages for the destruction of plain-
tiff's farm for agricultural and fruit raising purposes, the denial
of a nonsuit was proper, where the evidence showed that the
smelter was located a mile away from plaintiff's land about the
middle of the year 1898; that the fruit trees on plaintiff's land
were having a thrifty growth in the fall of the year 1898; that
in the spring of 1900, after the fumes from the smelter hung for
several hours in the atmosphere, the blooms on the trees became
blighted and nothing in the way of fruit formed; that the leaves
had a brown, cooked appearance and the alfalfa appeared
bleached; that no fruit was gathered from the orchard in 1900,
and the strawberry crop was greatly damaged in that year;
that some such effect was noticed during the year 1899, but not so
much; that, as shown by expert testimony, the presence of sul-
phuric acid released in the atmosphere by the roasting of ores
would produce such effects, and, if continued, would ultimately
kill the vegetation in the vicinity.

SAME — LIMITATIONS.

The fact that a smelter would inevitably occasion the damage
for which plaintiff sues would not start the running of the statute
of limitations from the first operation of the smelter, but the right
of action would accrue only at the time the fumes began to cause
damage.

SAME — CONTINUING NUISANCE.

The operation of a smelter, although a lawful business, is one which is sure to destroy vegetation upon which the fumes and smoke therefrom may be precipitated, and hence constitutes a continuing nuisance for which damages are recoverable for any period within two years prior to the commencement of action.

Appeal from Superior Court, Spokane County.—Hon. FRANK H. RUDKIN, Judge. Affirmed.

*Heyburn & Heyburn,* for appellant.

*Robertson, Miller & Rosenhaupt,* for respondent.

The opinion of the court was delivered by

WHITE, J.—This is an action brought to recover from the appellant damages in the sum of $30,000 for the total destruction of the respondent's property. Omitting formal allegations and the allegations as to the title of respondent to certain lands, which were admitted upon the trial, the complaint is as follows:

"That said land so described was near the towns of Rossland and Northport where agricultural and orchard land is scarce and the same was especially adapted for the growing of fruit trees and the raising of fruit thereon, including berries and vegetables, for all of which products there was at all times herein mentioned and will continue to be a ready market at high prices, and was also a good location and well adapted for a dairy farm, poultry and live stock; that this plaintiff cleared a large tract of land, more than ten acres in extent, and prior to the first day of January, 1898, had planted a large number of fruit trees, and the said trees on or about the first day of January, A. D. 1899, were of the average age of five years, healthy and promising, and this plaintiff on the said last mentioned date had also cleared more than three acres of land and had the same planted in strawberries, which said berry beds were then and had theretofore been prolific in the production of strawberries, and on said date this plaintiff had upon said land 1,400 fruit trees, 900 of which were apple trees, besides

cherry trees, plum trees, pear trees, prune trees and peach trees, which composed the remainder of said orchard, and there was of said land then and there adapted for orchard and fruit purposes more than fifty acres, which said land was of great and increasing value, and said entire land of this plaintiff was covered with growing timber suitable for mining, building and other purposes of the value of two thousand dollars and more, so standing upon said described property.

"That the said defendant corporation at all the times herein mentioned was engaged, and is now engaging, in conducting a smelter in the northern part of said city of Northport, and about one mile from the above described land, the property of plaintiff, at which smelter the defendant smelts the ores of the Le Roi mine, situated at the city of Rossland, British Columbia, together with other ores, and that all of the ores so smelted are composed of gold and silver combined with pyrites of iron and copper, all of said ores being known as base ores and containing large quantities of arsenic and sulphur, and when smelted or roasted, said ores by reason of said sulphur and other substances therein contained, to this plaintiff unknown, give forth sulphurous and other noxious fumes, deleterious to vegetable life and unpleasant and deleterious to man and cattle, and the same in the vicinity of said smelter, and more especially upon the land and home of this plaintiff, was and now is a nuisance.

"That within the last two years the said defendant smelting company has caused to be piled at and alongside of said smelter and upon piles of faggots and wood large quantities of raw ore from said mine, which, when so piled upon said faggots and wood, the said defendant company has fired said wood thereunder, and that said wood ignites the sulphur in said base ores, and so the said piles continue to burn until most of the sulphur is consumed out of the said ores, and that the said defendant has, during said years 1899 and 1900, caused to be roasted in said piles, known and called generally in mining stink piles, large quantities of ore, to-wit, about one million tons, and the said sulphur fumes and smoke, without in any way being confined or

controlled, at all the times herein mentioned have been and are permitted by the said defendant to hover in the air at and near said smelter, and more particularly over and above the lands of this plaintiff, and to fall and be precipitated upon the lands, plants and trees heretofore described, the property of the plaintiff, and, by reason of the said fumes so released by the said defendant in the process of smelting its ores, all the vitality in the soil and land of plaintiff has been destroyed, all of the fruit trees ab...e named, mentioned and described have been killed and rendered unproductive of fruit; all of the growing timber upon said land has been destroyed, and the value of the said property as a home for the plaintiff has been destroyed, and neither plaintiff or cattle can secure any substance out of the said land, the same being by the defendant entirely and totally destroyed and rendered useless and of no value for bearing fruit, orchard, vegetable, or any other purpose for which the said land was specially adapted, and so the entire value of the said land has been totally destroyed by the defendant company, to the great damage of this plaintiff.

"That the value of said orchard at the time the same was so destroyed by this defendant was of the reasonable value of fifteen thousand dollars ($15,000), and the remaining part of said farm, including said growing timber, berry bushes, etc., was of the reasonable value of fifteen thousand dollars ($15,000); that the entire value of said farm for any and all purposes has been destroyed by the said defendant so that the same is now totally worthless and of no value whatever; that the said fumes have so precipitated themselves over and upon this land as to permanently destroy the same for the purposes for which it was used by this plaintiff and for any and all other purposes whatsoever, to the damage of this plaintiff in the sum of thirty thousand dollars."

The appellant, for answer, alleged that the action was barred, because not commenced within two years after the cause of action accrued. § 4805, Bal. Code. The appellant further alleged that it had been engaged continuously in milling and roasting ores at its smelter since the 22d

day of July, 1898. The other allegations of the complaint, as to the adaptability of the land for the purposes alleged, the clearing of the land, the fruit trees, etc., on the land, the smelting of ores being a nuisance, and the damages averred, were denied. The jury, by its verdict, assessed the damages of respondent at $5,000, and on this verdict judgment was entered. The complaint in this action was filed on February 19, 1901. The trial of the cause was commenced on the 12th day of June, 1901, and the verdict of the jury, as disclosed in the record, was returned on the 14th day of June, 1901. On the 17th day of June, 1901, certain exceptions to the instructions given and refused by the court were filed by the appellant. No other exceptions to the instructions given or refused, save as stated, were taken. The respondent claims that no exceptions were taken to the instructions given or refused in the manner provided by law, and that this court cannot now consider such exceptions. We agree with the contention of the respondent in this respect. This matter has been recently passed upon by us. *State v. Vance*, 29 Wash. 435 (70 Pac. 34). We there announce the reasons for adhering to this rule. We shall not, therefore, consider the errors assigned relative to the giving and refusing to give certain instructions.

The appellant, at the close of the respondent's testimony, moved the court to dismiss the action because not commenced within the time allowed by statute, and, on the refusal of the court to grant said motion, duly excepted. The appellant then moved the court for a nonsuit, for the reason that the appellant had failed to prove the allegations of the complaint. This motion was denied, and the appellant duly excepted. Under these exceptions two propositions are advanced and discussed by the appellant: (1) That the two-year statute of limitations had run when this action

was commenced; (2) that the proof of damages was in less amount than that pleaded in the complaint; that the action was for the full value of the property; that the proof failed as to the total destruction of the property, and, under the allegations of the complaint, the respondent could not recover for partial destruction, and that any proof as to injury which did not result in total destruction should not have gone to the jury. The Code provides:

"No variance between the allegation in a pleading and the proof shall be deemed material, unless it shall have actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits. Whenever it shall be alleged that a party has been so misled, that fact shall be proved to the satisfaction of the court, and in what respect he has been misled, and thereupon the court may order the pleading to be amended upon such terms as shall be just." Bal. Code, § 4949.

The appellant did not claim at the trial, and does not now claim, that it has been misled by the allegations of the complaint. It is axiomatic that the whole is greater than the parts, the whole includes the parts; and, under the allegation of total destruction, in view of § 4949, *supra,* a partial destruction might be shown. The respondent's farm was less than a mile in a direct line from the appellant's smelter. In the early spring of 1899 there were on the farm 1,344 fruit trees, consisting of apple, pear, prune, peach, plum, and apricot trees; the apple trees, 933 in number, being from three to four years old. This orchard occupied about fourteen acres, thoroughly cleared. From this orchard a ditch for irrigation purposes extended to Deep Creek, about a mile, with an ample flow of water. This ditch cost in the neighborhood of $1,500. The trees were making a thrifty growth in the fall of 1898. In the spring of 1900, when the trees were in bloom, after the fumes from the smelter hung for several hours in the at-

mosphere, the blooms seemed to be blighted, and nothing in the way of fruit formed. Some effect from the fumes on the leaves of the trees could also be seen. They had a brown, cooked appearance. The alfalfa had a bleached appearance. Some such effect was observed in 1899, but not so much. The worst damage seems to have been done in 1900. No fruit was gathered from the orchard in 1900. The berry crop was also greatly damaged in that year. Where there should have been 500 crates, there were only 120 crates. Berries were worth from $3.60 to $1.20 per crate. There was evidence tending to show that the orchard, small fruit, herbage, and forest trees were destroyed or injured by the fumes from the ore piles and smelter, and that this destruction was general in 1900. The testimony showed that the fruit trees in the orchard were worth $5 per tree before they were destroyed; that the orchard before its destruction, would pay interest on an investment of $1,000 per acre; that the tract of land mentioned in the complaint consisted of 160 acres, and that there were forest trees on the land outside of the orchard, and they were affected and injured by the fumes. The fumes also affected vegetation such as alfalfa and grass. The respondent testified that, in his judgment, the property was totally destroyed. He further testified, in effect, that he did not become convinced in his mind that the fumes destroyed the crops and trees, etc., and ruined the place, until in July or August, 1899. There was some testimony as to the value of the forest trees that were injured. There was testimony that the appellant commenced roasting ores and sending forth the destructive fumes in the spring of 1898. There was testimony by witnesses other than the respondent as to the damages, the amount thereof, and that the material damage became noticeable in the fall of 1899. There was evidence to go to the jury of at least the partial

destruction of the fruit trees, berries, and forest trees and vegetation in 1899 and 1900, and that it was in those years the damage became appreciable; estimates of this damage were also testified to. The following is part of the examination of a witness for the respondent, who testified as an expert:

"Q. Suppose, for instance, on a cloudy day there should be a cloud immediately above the smelter, what would occur, if anything, when the smoke approached that cloud? A. The smoke would be observed to a large extent about the cloud. Q. And if rain fell from that cloud in the vicinity, what effect if any would that rain have upon the vegetation? A. It would have a blighting effect and wilt the leaves, burn the leaves. Q. Do you know of any instance in any standard authority with reference to how quickly such blight would occur? A. Yes, sir. Q. State to the jury. A. Peters gives an instance where a cloud absorbed the smoke from a number of roast heaps and the rain falling from this cloud eight miles distant from the roast heaps withered a corn field in less than an hour and a half, completely destroyed a young, growing corn field. . . . . Q. Now, Mr. Snyder, suppose that a smelter that releases in the atmosphere approximately seventy tons of sulphur per day [there was evidence showing that that was the amount released by this smelter when in operation] in the form of sulphurous acid, is in constant operation for two years or more; that an orchard about one mile from the smelter and in the direction of the prevailing winds is scorched in the spring so that the blooms drop from the trees, and thereafter the leaves are scorched so that they drop off and new growth occurs, and there is no fruit grown in the orchard; that it is well irrigated and well cultivated the second year, and in the springtime the same effects are visible, only more so; the leaves are scorched in the entire orchard so that they are browned and the orchard looks like it is dead, and it produces no fruit that year, and the smelter is continued in operation, state to the jury what you would say would be the cause of that effect on that orchard, being only one smelter in the neighborhood."

This question was objected to, and the court ruled that the witness could answer whether or not the fumes from the smelter would produce these results.   The witness answered:

"Yes, sir, they would produce those results."

The question was then asked the witness:

. "What would be the effect if that amount of sulphur were released in the atmosphere for more than two years immediately prior say to this suit upon the health of this orchard ?"

The witness answered:

"You might say it would destroy the health of the orchard.   While it might come in leaf again, the leaves would be destroyed before long by the fumes—from the effect of the fumes.   Q. Would such trees recover or not ? A. If the cause was kept up *they would eventually die.*"

There was testimony tending to prove all the facts suggested in the hypothetical question referred to as being existing facts.   We do not think, therefore, that the court erred in denying the motion for a nonsuit.

It is claimed by the appellant that it erected its plant and operated it by authority of law.   There is no allegation in the complaint that the fumes escaped through careless management, or by reason of negligent construction.   The results are necessary results arising from the character of the ore smelted and the manner of operating the smelter. The smelter is not operated in any manner different from that in which smelters are usually operated.   The business carried on is a lawful business.   The fumes are poisonous and destructive.   No way to overcome the difficulties has ever been found.   It was, therefore, a foregone conclusion, when the smelter was erected and began operations, that the vegetation that happened to grow where the fumes and smoke should be precipitated would be subject to death.

The smelter was erected before, and began its operations on, July 22, 1898. From these premises the appellant contends that the cause of action accrued July 22, 1898, and, as the complaint was not filed until February 19, 1901, the two-year statute had then run. It is elementary that the statute of limitations begins to run against a cause of action from the time it accrues and becomes due and payable; or, as otherwise expressed, the cause of action or suit arises, according to the universal rule in courts of both law and equity, when and as soon as the party has a right to apply to the proper tribunal for relief. *Ganser v. Ganser,* 83 Minn. 199 (86 N. W. 18, 85 Am. St. Rep. 461).

The appellant cites us to the case of *Rowlstone v. C. & O. Ry. Co.,* 54 S. W. 2 (21 Ky. Law Rep. 1507). In that case the petition stated that the company did, without right, occupy Washington street, in the city of Covington. The answer controverted this statement, alleging that it occupied Washington street by right and by authority of law. There is no allegation that the noises, jars, steam, smoke, cinders, blowing of whistles, and gases were unnecessary or unusual in the careful and prudent operation of the trains over the tracks on Washington street. The court of appeals of Kentucky says:

"We are of the opinion, from the proof in the bill of exceptions, that appellees proved an undoubted right to use Washington street for their railroad tracks, and to operate their trains thereon, and also proved that such use had been for more than five years before the institution of this action. If, therefore, the action be for such damage as will necessarily result from the prudent operation of the road (that is, from noises, smoke, cinders, and such like incidents of the necessary and prudent and careful operation of the trains) the cause of action is barred by the statutory limitation of five years pleaded and proven." *Louisville & N. R. R. Co. v. Orr,* 91 Ky. 109 (15 S. W. 8); *Stickley v.*

*Chesapeake & O. R. R. Co.,* 93 Ky. 323 (20 S. W. 261);
*Onions v. Covington, etc., Ry. Co.,* 21 Ky. Law Rep. 820
(53 S. W. 8).

Quoting further from said decision, the court says:

"We are of the opinion that the rule announced in the
Orr case is the law. That rule, as we understand it, is:
The statute of five years' limitation will bar any claim for
damages resulting from the necessary and prudent opera-
tion of a railroad, along or over a street. But, for any
damage in operating the trains that by proper precaution
could be prevented, the company would be liable, and for
this damage a cause of action does not accrue until the
wrong is done, and limitation runs only from that time.
. . . If the action had been for negligent or improper
use of appellees' cars and trains on Washington street,
an entirely different case would be presented. . . .
It is for the use of Washington street without right
or authority—wrongful use—a trespass on the street, and
consequent injury to appellant. To constitute an action for
negligence or improper use, there must have been an aver-
ment in the petition that these noises, jars, smoke, cinders,
etc., complained of were unusual and unnecessary in the
careful and prudent operation of the road, or that by pru-
dent operation of the road, such might have been prevented.
There appears no such allegation, . . . "

In *Louisville & N. R. R. Co. v. Orr, supra,* the court
says:

"A railroad must be regarded as a permanent structure,
and, when its construction in the streets of a town or city is
authorized by legislative and municipal authority, it can-
not be said to be a nuisance when operated in a careful and
proper manner. All damages that would naturally result
from the operation of the road can be ascertained and de-
termined when the road is being constructed, or rather
when it is operated, so as to show the damages that will
necessarily result from its prudent management. . . .
They all may be recovered in a single action, and, there-
fore, the statute of limitations begins to run from the

time the action could have been first instituted.   .   .   .
In ordinary actions for trespass to real estate the recovery
is for the injury accruing up to the inception of the action;
but, where a railway is constructed in a street, the injury, if
any, to the adjacent property is permanent in its character,
and continuing as long as the road is operated, and the
cause of action for the damages resulting from its prudent
operation arises as soon as the cars begin to run, and in the
estimate is included the future operation of the road; for,
if otherwise, there would be a cause of action for every
time the cars passed the dwelling of the owner."

In the case of *Parker v. Atchison,* 58 Kan. 29 (48 **Pac.**
631), the court says:

"Power is also given to the city to alter and change the
channel of streams and water courses.   Gen. St. 1889, par.
555.   In doing so, however, reasonable care should be exer-
cised to avoid unnecessary injury to private property.   It
appears, therefore, that the improvement was authorized
and cannot be said to be illegal.   The fact that there is
statutory authority for the same does not exempt the city
from liability for injury to private property.   In making
the improvements, it is not required to provide for extra-
ordinary floods, and storms, but must exercise reasonable
care to guard against such conditions as are ordinarily in-
cident to the creek.   It would seem from the testimony
that the mere improvement of the alley could not have op-
erated as a very serious injury to the property of the plain-
tiffs in error, but assuming that it was injured to some ex-
tent, they were too late in claiming a recovery.   As the im-
provement is permanent in its character, but one action
could be maintained, in which all damages, present or pros-
pective, would be recoverable.   The action accrued in 1884,
when the structure was completed, and under the third sub-
division of section 18 of the Civil Code, it was barred at
the end of two years."

The appellant contends that the principle announced in
these decisions is applicable in the case at bar.   We think
not.   From the very moment the cars began to be operated

the damage existed and was apparent, and the present and prospective amount thereof could be ascertained by proper proof. In announcing the rule as laid down in the *Orr Case*, the Kentucky court of appeals said, "A cause of action does not accrue until the wrong is done." Supposing, in the case under consideration, the wind had not carried the fumes over the respondent's land until six months after the smelter commenced operations, could it be said that there was any wrong done to the respondent during the six months? The evidence tends to show that the damage actually done was not apparent or material until in the month of July or August, 1899. Not until that time was the wrong done to the respondent for which a right of action for damages accrued. An action to recover damages for an injury cannot be sustained until the injury actually occurs, although it may be apparent that injury will inevitably result. A cause of action to prevent the injury by injunctive relief might exist, but a cause of action to recover damages commences to run from the time the damages occur by the injury or destruction of property claimed to have been damaged. It is lawful to operate a smelter. No one has a right, however, to pursue a lawful business, if thereby he injures his neighbor, without compensating such for the damages actually sustained. This action may be sustained also on the grounds of a continuing nuisance. *Doran v. Seattle,* 24 Wash. 182 (64 Pac. 230, 54 L. R. A. 532, 85 Am. St. Rep. 948).

The judgment of the court below is therefore affirmed.

REAVIS, C. J., and HADLEY, FULLERTON, ANDERS, MOUNT and DUNBAR, JJ., concur.